ALBERT R. WILLARD & another *vs.* GEORGE H. WRIGHT & others.

Franklin.    September 21, 1909. — October 21, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Agency,* Broker's commission.    *Broker.    Partnership.*

In an action by a broker to recover a commission for procuring a purchaser for a business of the defendant, there was evidence that the defendant placed the business in the hands of the plaintiff for sale, naming a certain price, that one P. told the plaintiff that he knew of two men that were looking for business, that the plaintiff asked P. to communicate to them the fact that this business was for sale, that P. promised to do so, and communicated the fact to one person through that person's wife, and that, that person wishing to buy only one half of the business, P. suggested to another person that he should buy the other half, whereupon the two bought the whole business for the price named by the defendant to the plaintiff.    *Held,* that this evidence warranted a verdict for the plaintiff.

A broker who is employed to sell certain property earns his commission when he brings to his principal a customer who is ready, willing and able to buy the property at the price named by the seller, although the broker takes no part in making the contract of sale.

When all the members of a partnership engaged in a business have decided to sell their business, it is within the authority of one of the partners to employ a broker to make the sale.

CONTRACT by Albert R. Willard and Walter Austin, copartners doing business under the name of the "Wolfskiel Real Estate Bureau," to recover $375 as a commission for procuring a purchaser for a trucking and ice business in Greenfield belonging to the defendants, copartners doing business under the name of George H. Wright and Company, by reason of which the defendants sold such business to such purchaser for the sum of $15,000.    Writ in the District Court of Franklin dated October 8, 1907.

On appeal to the Superior Court, the case was tried before

*King*, J. The evidence is stated or described in the opinion. The judge refused to order a verdict for the defendants, and submitted the case to the jury, who returned a verdict for the plaintiffs in the sum of $392.24. The defendants alleged exceptions, raising the questions which are disposed of in the opinion.

*W. A. Davenport*, for the defendants.

*C. N. Stoddard*, for the plaintiffs.

LORING, J. 1. We are of opinion that the presiding judge was right in submitting the case to the jury.

It was admitted that the defendant copartners (three in number) had determined to sell their ice and trucking business, and that they had employed one Carson as a broker to find a purchaser. The plaintiff Willard testified that he met the defendant Wright on the street, at a time which (the evidence showed) was after this had been done, and that in the conversation between them at that time Wright told Willard that he was going to leave Greenfield and that the ice and trucking business of the partnership was to be sold; that Willard then asked the defendant to let him have "a chance at it"; that Wright said that he had met Carson and told him he "hoped he could sell it"; to which the plaintiff replied that it was customary to let all the brokers "have a chance at it, and the man that makes the sale is entitled to the commission"; that Wright then said, "You bring me a customer and I will pay you a commission." That Wright then told him the number of horses, "the lot of wagons, and the ice business and the truck business," and in answer to the plaintiff's question "What is your price," said, "It inventories at about $15,000." "I would sell the ice business separate, and I would sell the trucking business separate, — $9,000 for the ice business and $6,000 for the trucking business." Willard put these items on paper and entered them on one of his regular forms on the same day.

There was testimony that at some subsequent time one Walter L. Phelps called at the plaintiffs' office about buying a farm, and Willard told him that the defendants' ice and trucking business was for sale. That Walter L. Phelps then said that he knew of two men that were looking for business; that Willard asked him to write to them and Phelps said that he would do so.

Willard further testified that "later on," he called at Phelps's office to see whether he had written to these two persons. After that Walter L. Phelps told Charles S. Phelps's wife, who was then in Greenfield, that the ice and trucking business was for sale, and she "communicated it" to her husband; and in the words of Walter L., "he caused Charles S. Phelps to be acquainted with the fact that" the defendants' business was for sale.

Charles S. Phelps testified that as soon as he learned of the fact that the business was for sale he called his brother on the telephone, and later came to Greenfield and started to go to the defendants' office with his brother. On the way Willard met them and went with them to the defendants' office. Willard testified that he introduced Charles S. Phelps to Ballou, one of the defendant partners, in these words : "This is Mr. Phelps. He has come to look at your business with the intention of buying it if it suits him and the price is right." There was evidence that Charles S. Phelps at first tried to buy the one half of the business owned by the defendant Wright, and finding that he could not do that interested one Lamb in the matter ; and finally that the business was bought by Charles S. Phelps and Lamb for $15,000. There was abundant evidence that Charles S. Phelps and Walter L. Phelps and Charles S. Phelps's wife first learned from the plaintiffs that the ice and trucking business of the defendants was for sale. It appeared that Carson had previously offered the business to Lamb, but that the price was too large for him alone, and at that time he determined not to buy. There was evidence that Lamb's determination to buy jointly with Charles S. Phelps came from Walter L. Phelps's having suggested to him, Lamb, the joint purchase. Lamb testified in answer to the question, "Who did you first talk to in relation to buying out a part of George H. Wright's business?" "I think it was Walter Phelps. . . . Walter L. Phelps." Carson testified that he did not claim a commission. Finally there was testimony that the defendant Wright had said that he placed the business in the hands of Willard for sale; that the business had been sold, and that "Mr. Willard brought the customer."

There was great conflict in the testimony, but this evidence, if believed, warranted a verdict in favor of the plaintiffs.

. The defendants contend that *Gleason* v. *Nelson*, 162 Mass. 245, is fatal to the plaintiffs' claim to a commission. The difficulty in that case was that the information that the property in question was for sale came to the person who ultimately bought through "a third person not employed by Nelson for the purpose, or authorized by him to make the communication." But in the case at bar Willard asked Walter L. Phelps to communicate the fact that the business was for sale to the two persons he had in mind, and Walter L. promised so to do. Walter L. therefore was authorized if not employed to communicate the fact to Charles S. Phelps and to Lamb. With respect to *Gleason* v. *Nelson*, see *Carnes* v. *Finigan*, 198 Mass. 128, 130.

The defendants' next contention is that this case comes within *Ward* v. *Fletcher*, 124 Mass. 224. That case would be decisive against a claim by Carson for a commission if he had made one. For as it was said in that case, "One broker, who is unsuccessful in effecting a sale, does not become entitled to a commission upon the success of another." The jury were warranted in finding that the joint purchase by Charles S. Phelps and Lamb was procured through Walter L. Phelps, under his agreement with the plaintiffs to mention the sale of the business to two men who were looking for business.

2. Were it not for the contention of the defendants to the contrary, it would not be necessary to state that the question whether the plaintiffs were the efficient means of bringing the seller and the purchaser together was for the jury and not for the court.

3. It is now settled that a broker employed to sell earns his commission when he brings to his principal a customer who is ready, willing and able to buy, and that it is not necessary for him to take part in making the contract of sale in order to entitle himself to a commission. *Fitzpatrick* v. *Gilson*, 176 Mass. 477. *Taylor* v. *Schofield*, 191 Mass. 1.

4. In this case it was admitted that all the partners had decided to sell their business. Certainly in such a case it is within the authority of one of the partners to employ a broker to make the sale. See *Durgin* v. *Somers*, 117 Mass. 55.

5. Evidence of the arrangement made by Willard with Wal-

ter L. Phelps and what was done in pursuance of it was competent to show the fact that the purchasers were procured by the plaintiffs.

*Exceptions overruled.*